# UNITED STATES DISTRICT COURT

FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

2005 DEC 10  AM 4: 24

CLERK_____
SO. DIST. ᴏF GA.

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | |
|---|---|
| WILLIAM P. CAMP, JR.,    ) | |
|       ) | |
|    Plaintiff,    ) | |
|       ) | |
| v.    ) | Case No.  CV403-93 |
|       ) | |
| JO ANNE B. BARNHART,    ) | |
| *Commissioner of Social Security*,    ) | |
|       ) | |
|    Defendant.    ) | |

## REPORT AND RECOMMENDATION

Plaintiff has brought this action challenging the Social Security Commissioner's denial of his application for a period of disability and disability insurance benefits. For the reasons that follow, the Court recommends the Commissioner's decision denying benefits be AFFIRMED.

## I.   BACKGROUND

### A.   Procedural History

Plaintiff filed for a period of disability and disability insurance benefits on May 13, 1999. Tr. at 57-59. His claim was denied initially and on reconsideration.   Tr. at 32-35, 38-41.   Plaintiff requested an

administrative hearing, which was held on May 10, 2000 before Administrative Law Judge ("ALJ") Alan L. Bergstrom. Tr. at 42-43, 47-50. At the hearing, the ALJ heard testimony from plaintiff and a vocational expert. Tr. at 302-25. The ALJ kept the record open in order to receive a consultative psychological evaluation. Tr. at 317. The ALJ issued a decision denying plaintiff's application for benefits on March 29, 2001. Tr. at 13-24. On October 24, 2002, the Appeals Council denied plaintiff's request for review of that decision. Tr. at 5-6. Plaintiff then filed the present action for review of the Commissioner's decision, pursuant to 42 U.S.C. § 405(g). Plaintiff has exhausted his administrative remedies, and review under 42 U.S.C. § 405(g) is now appropriate.

### B.   Factual and Medical Background

Plaintiff was 41 years old when he allegedly became disabled and is currently 47 years old. Tr. at 22, 57. He completed the tenth grade but has received a GED. Tr. at 15. Plaintiff worked as a jet engine mechanic in the Air Force for four years. Tr. at 229. Plaintiff worked as a millwright at a paper mill for thirteen years prior to the plant's closing in October 1998. Tr. at 229.

As of the date of the ALJ's decision on March 29, 2001, plaintiff had not worked in any substantial gainful activity since March 18, 1999, his amended onset date of disability.  Tr. at 15.[1]

### Medical Evidence Presented to the ALJ

Plaintiff was involved in a car accident in 1997, which resulted in a herniated disk in his back, as well as a concussion.  Tr. at 126.  On December 18, 1997, plaintiff saw Randolph C. Bishop, M.D., at St. Joseph's Hospital in Savannah, Georgia, due to his herniated disk.  Tr. at 125.  Dr. Bishop performed a right L5/S1 diskectomy to relieve the pain in plaintiff's back.  Tr. at 125-27.  During the surgery, Dr. Bishop decompressed the nerve root and removed loose fragments of disk.  Tr. at 126.  The hospital discharged plaintiff the day after his surgery, and he left able to walk and with essentially no pain.  Tr. at 125.  Plaintiff was given pain medication

---

[1]The Court notes that plaintiff has had several legal problems while his case has been pending.  Plaintiff pleaded guilty in this Court to one count of felony possession of an unregistered silencer on February 7, 2002.  CR401-168, Doc. 34.  On April 11, 2002, this Court sentenced plaintiff to eighteen months' imprisonment, three years' supervised release, a $4,000.00 fine, and a $100.00 special assessment.  Id., Doc. 37.  In addition, plaintiff pleaded guilty to one count of possession of a firearm by a felon on January 24, 2005.  CR404-251, Doc. 25.  On April 21, 2005, this Court sentenced plaintiff to forty-six months' imprisonment, three years' supervised release, a $5,000.00 fine, and a $100.00 special assessment.  Id., Doc. 30.

and muscle relaxants and was instructed to return for a follow-up visit after four weeks. Tr. at 125.

On November 20, 1998, plaintiff saw Kenneth R. Hardigan, M.D., of Savannah Cardiology. Tr. at 138-42. Plaintiff was referred by Sharon Kestin, M.D., and the emergency room at Candler Hospital in Savannah, Georgia. Tr. at 138. Plaintiff sought medical attention at the emergency room due to pain radiating from his chest and down his left arm, as well as a rapid heart beat and lightheadedness. Tr. at 138. Dr. Hardigan concluded, after consultation with plaintiff and a series of tests, that plaintiff's pain was not cardiac in nature. Tr. at 139. Plaintiff's stress test was negative, and his symptoms were atypical of those associated with cardiac problems. Tr. at 138. Dr. Hardigan instead believed that plaintiff's discomfort resulted from a gunshot wound plaintiff received in the chest when he was fifteen years old. Tr. at 139. Dr. Hardigan suggested a medical treatment of Motrin for pain and a cholesterol follow-up with Dr. Kestin. Tr. at 139.

During his November 20, 1998 visit with Dr. Hardigan, plaintiff described his medical history, which was recorded in Dr. Hardigan's summation. Tr. at 138. Plaintiff complained of occasional rapid heart beat

4

and lightheadedness but no interference with normal activity.  Tr. at 138.

Plaintiff reported a family history of coronary disease and diabetes.  Tr. at

138.  He also noted no history of elevated cholesterol, smoking, diabetes, or

hypertension.  Tr. at 138.  Dr. Hardigan found that plaintiff's medical

history was non-contributory other than the previous gunshot wound.  Tr.

at 138.

Plaintiff also indicated that he had lost his job five weeks prior to his

trip to the emergency room.  Tr. at 138.  Other portions of the record

indicate that plaintiff lost his job when the paper mill he worked for closed

in late 1998.  Tr. at 286.  At the same time, plaintiff's wife was pregnant

with plaintiff's fifth child, and she was three days overdue.  Tr. at 138.

Plaintiff was in his fourth marriage.  Tr. at 57-58.  Plaintiff was forty years

old at the time, though his wife was seventeen, and they had been married

less than five months at the time of plaintiff's hospital visit.  Tr. at 57, 138.

Plaintiff indicated that he enjoyed casting shrimp nets for up to thirty

minutes at a time without any difficulty.  Tr. at 138.

On March 10, 1999, plaintiff returned to Dr. Hardigan, again

complaining of recurrent chest pain and shortness of breath.  Tr. at 136.

Plaintiff reported that the Motrin, recommended by Dr. Hardigan during

his prior visit, reduced his chest pain but also created gastritis, an inflamation in the stomach, and plaintiff stopped taking Motrin. Tr. at 136. Plaintiff also reported that Zocor, a medicine used to control cholesterol levels, made him feel better, though Dr. Hardigan noted that this result was "not an obviously physiologically understandable entity." Tr. at 136. The Zocor apparently gave plaintiff headaches, and he discontinued that medication in favor of Pravachol. Tr. at 136. By this visit, approximately four months after his initial visit with Dr. Hardigan, plaintiff's wife had given birth to his fifth child, he was still drinking socially, and he was still shrimp fishing regularly without difficulty, though he had decreased his shrimp consumption. Tr. at 136.

On March 26, 1999, Dr. Hardigan performed a left chest catheterization. Tr. at 144. Dr. Hardigan concluded that the catheterization clearly showed no coronary disease and hoped that the results of the test would provide therapeutic relief to plaintiff, giving him confidence to proceed with normal daily activities without fear of coronary problems. Tr. at 145.

On March 18, 1999, plaintiff saw Thomas M. Stanley, M.D., for a neurological consultative examination. Tr. at 177. Plaintiff sought Dr.

Stanley's help due to severe back pain. Tr. at 177. Plaintiff claimed that he experienced such pain as the result of a fall in his garage when he had attempted to lift his fifty-pound toolbox. Tr. at 177. Plaintiff told Dr. Stanley that this accident happened recently before the visit and that his back had been hurting him for approximately four days prior to March 18.[2] Tr. at 177. Plaintiff cited two previous problems with his back: a work-related accident approximately seven years earlier when plaintiff was lifting a heavy spool of wire and felt a sharp, vertically-traveling pain in his back and his 1997 car accident and subsequent surgery described above. Tr. at 177. Plaintiff reported taking over-the-counter Tylenol for his pain, as well as the Zocor and Pravachol he also reported to Dr. Hardigan. Tr. at 136, 177. Dr. Stanley reached the conclusion that plaintiff needed physical therapy and prescribed amitriptyline and Flexeril. Tr. at 178. Dr. Stanley also noted that "[h]e should be considered for retirement from millwright work and is to be considered for work involving very little bending, twisting

[2]The Court notes the inconsistencies in the record around the time of plaintiff's original social security filing. According to the patient history recorded in Dr. Hardigan's files on March 10, 1999, plaintiff was out of work and anticipating returning to work later that spring. Tr. at 138. On March 18, 1999, plaintiff represented that he was injured at least four days previously when lifting his toolbox to go to work. Tr. at 177. According to the information that plaintiff provided Dr. Christie in an August 26, 2000, psychological evaluation, the mill at which plaintiff worked closed in 1998. Tr. at 286. Dr. Sutcliffe notes in his report that the mill closed in October 1998. Tr. at 229.

or lifting, in a sedentary capacity." Tr. at 178.

Due to continued back pain, plaintiff had surgery on May 4, 1999, consisting of a complete laminectomy of the right L5, a partial laminectomy of the right S1, a diskectomy of L5/S1, and a posterior lumbar interbody fusion of the right L5/S1. Tr. at 170. Dr. Bishop, who operated on plaintiff in December 1997, performed this surgery. Tr. at 170. Plaintiff was discharged the next day and prescribed Percocet for pain. Tr. at 168.

Following his back surgery on May 4, 1999, plaintiff had a follow-up visit with Dr. Stanley, on May 11, 1999. Tr. at 173-76. Plaintiff reported lingering pain in his back and leg, as well as numbness in his foot below the ankle. Tr. at 173. Interestingly, Dr. Stanley's report shows some inconsistencies with the overall medical record, including no history of chest pain and no reports of trouble with memory, depression, sleeping, or a negative outlook. Tr. at 174. Dr. Stanley recommended a physical therapy plan and a walking program, as well as tricyclic medication. Tr. at 176. Dr. Stanley also reiterated his previous opinion that plaintiff was no longer suited for millwright work and should retire to a line of work "which would involve very little bending, lifting or twisting in a sedentary capacity, sitting, standing, or walking primarily." Tr. at 176.

8

On October 4, 1999, plaintiff saw Dr. Bishop for a post-operative consultation.  Tr. at 192.  Dr. Bishop noted the plaintiff still had a lot of back pain but that he was progressing overall.  Tr. at 192.  Dr. Bishop believed that plaintiff's post-operative X-rays were ~~positive~~ *encouraging.*  Tr. at 192.  Dr. Bishop opined that plaintiff could return to normal work duty after one additional month.  Tr. at 192.

On October 15, 1999, plaintiff again saw Dr. Stanley for a follow-up visit after his back surgery.  Tr. at 189-91.  Plaintiff, by this time, had no health insurance and faced difficulty paying Dr. Stanley, though he agreed to see plaintiff.  Tr. at 189.  Dr. Stanley noted lingering pain in plaintiff's back and weakness in his right leg.  Tr. at 189.  Plaintiff claimed that he had elevated cholesterol, some palpitations, and occasionally had difficulty breathing and became very dizzy.  Tr. at 189.  Dr. Stanley also reported that plaintiff was nervous, anxious, and depressed, as well as badly in need of money.  Tr. at 189.  Dr. Stanley recommended the drug Remeron, of which he gave plaintiff a two months supply for free.  Tr. at 190.  Dr. Stanley also noted the need for extra monetary support such as Social Security and opined that while it was likely unreasonable for plaintiff to immediately return to work, plaintiff could work in a sedentary position.

9

Tr. at 190.

On November 27, 1999, plaintiff saw Joseph B. Sutcliffe, M.D., for a psychiatric consultative evaluation at the request of the Social Security Disability Adjudication Section.   Tr. at 228-31.   Among the physical disabilities of which plaintiff complained to Dr. Sutcliffe were chest pain due to his gunshot wound, headaches, pain in his lower back and right leg, numbness below his right knee, a leaky heart valve, and very high blood pressure.  Tr. at 228.  Plaintiff also reported a chronic cough which he believed was due to working around asbestos without a mask from 1980 to 1984.  Tr. at 228.  Plaintiff claimed he drank approximately one beer per week.  Tr. at 229.

With respect to plaintiff's mental status, Dr. Sutcliffe reported that plaintiff appeared to be slightly sedated and irritable during his consultation. Tr. at 228. Plaintiff complained of forgetfulness, particularly with paying bills.  Tr. at 228.  He mentioned getting headaches and feeling unable to focus on what he was talking about or coping with various problems.  Tr. at 228.  Plaintiff reported sleeping excessively, having an aggravated mood, feeling guilty about borrowing money from his father-in-law, and having a low sex drive.  Tr. at 228.  Plaintiff mentioned significant

financial problems which contributed to his worrying, as well as a custody

battle involving four children from a previous marriage.  Tr. at 228.

Dr. Sutcliffe determined plaintiff's estimated intelligence to be

average to low average.  Tr. at 230.  Dr. Sutcliffe noted plaintiff appeared

lethargic but that his medications, Ambien and Xanax, should have worn

off by the time of his appointment.  Tr. at 230.  Dr. Sutcliffe diagnosed

plaintiff with cognitive disorder NOS and major depressive disorder.  Tr. at

230.  He reported that it was "difficult to assess how much of [plaintiff's]

problems with short term recall and clear thought processes are due to

treatable and reversible causes (e.g. depression, medication side effect,

hypoperfusion due to heart problems) and how much are due to irreversible

causes (eg. brain injury)."  Tr. at 230.  Plaintiff apparently represented a

low motivation to perform his best during the assessment, further skewing

the results.  Tr. at 230.  Dr. Sutcliffe opined that losing his job in 1998

probably created significant depression for plaintiff.  Tr. at 230.  Dr.

Sutcliffe also noted that plaintiff appeared physically uncomfortable during

the interview, relied on his cane, and did not appear to be embellishing his

pain.  Tr. at 231.

On January 6, 2000, plaintiff again visited Dr. Stanley, complaining

of back pain and some giveway in his ankle.  Tr. at 251-52.  Plaintiff also reported numbness in his right leg, calf, and foot during the sensory examination.  Tr. at 251.  Dr. Stanley described plaintiff as anxious, nervous, and depressed, as well as complaining that his medications made him sleepy in the daytime. Tr. at 251. Dr. Stanley opined that there might be some S1 nerve root involvement. Tr. at 252.  Dr. Stanley discontinued plaintiff's medication, Remeron, and plaintiff refused to try Effexor. Tr. at 252.

Plaintiff went to the Memorial Medical Center on February 24, 2000, at the request of Dr. Stanley, concerning his back pain, ankle pain, and shortness of breath.  Tr. at 257-63.  Plaintiff filled out a handwritten medical history. Tr. at 259. X-rays revealed three small buckshot pieces in the soft tissue of his chest and no abnormality in his left ankle. Tr. at 260. The conclusion of the assessment was chronic back pain, forgetfulness possibly related to depression, high cholesterol, non-cardiac chest pain, history of palpitations controlled by medication, chronic cough, and a left ankle sprain. Tr. at 257. Though he scheduled a neurological examination for March 8, 2000, plaintiff did not show up. Tr. at 256.

On April 20, 2000, Dr. Jack Ramage performed a Physical Capacity

Evaluation of plaintiff.  Tr. at 267-70.  The tests showed that plaintiff's range of motion in the upper and lower extremities were within normal ranges, though there were limitations secondary to a previous collarbone fracture affecting his left shoulder, and plaintiff complained of some pain in his right hip and leg.  Tr. at 268-69.  During a walking test, plaintiff was able to endure only twenty seconds before he stopped, reporting pain as 10 on a scale of 10.  Tr. at 269.  During the assessment, plaintiff sat for two and one-half hours, with a maximum sitting time of forty minutes.  Tr. at 269.  Plaintiff stood for thirty minutes with ten minutes as his maximum. Tr. at 269.  The evaluation concluded that plaintiff was not at risk for falls according to the Functional Reach Test.  Tr. at 269.  When plaintiff reported significant pain, there were only minimal increases in his heart rate, indicating he magnified his actual pain.  Tr. at 270.  Furthermore, the findings of the test were labeled inconclusive of his true ability due to a sub-maximal effort.  Tr. at 270.

On April 12, 2000, plaintiff went to the Gateway Community Service Board for a comprehensive psychiatric evaluation.  Tr. at 272-84.  Plaintiff reported on his medical history questionnaire that he was currently experiencing problems with asthma, high blood pressure, heart disease, and

migraine headaches. Tr. at 278.  He commented that he had undergone two back surgeries, he had bones replaced in his backbone, his right leg was permanently numb, he had migraines from nerve damage, his chest hurt from lead scar tissue, he could not get enough air in his lungs, he tired easily, and his left ankle popped out of joint randomly and caused him to fall.  Tr. at 278.  He reported that he drank beer but not excessively.  Tr. at 279.   He checked that he had difficulty seeing, speaking, hearing, and walking, as well as having migraines and forgetfulness.  Tr. at 279.

In the doctor's report from the Gateway Community Service Board, Dr. Halani noted that plaintiff was living off his savings, his father-in-law's support, and owed $5,000.00.  Tr. at 275.  Plaintiff reported weight gain of thirty-five pounds in the previous year.[3]  Tr. at 274.  Dr. Halani reported that plaintiff drank between two and four beers per day in order to calm himself.  Tr. at 273, 277.  In his mental status evaluation, plaintiff was cooperative yet anxious, and the results revealed that plaintiff's memory, cognitive function, judgment, and insight were all intact.  Tr. at 17.  Dr. Halani's diagnosis was pain disorder with psychological features and

---

[3]The Court notes that plaintiff's self-reported weight in the Gateway questionnaire on April 12, 2000 was 205 pounds.  Tr. at 278.  On November 20, 1998, plaintiff's weight was recorded as 198 pounds at Dr. Hardigan's office.  Tr. at 131.

14

personality disorder NOS.  Tr. at 17.  Dr. Halani prescribed Zoloft.  Tr. at
284.

On August 26, 2000, plaintiff saw Ann M. Christie, J.D., Psy.D., for
a psychological evaluation.  Tr. at 285-90.  Plaintiff framed his work-
disabling medical conditions as back pain, the lead in his chest resulting
from his childhood gunshot wound, a bad heart, and trouble understanding.
Tr. at 285.  Plaintiff's wife also contributed suggestions of numbness in his
right leg, migraine headaches, forgetfulness, grumpiness, and irritability.
Tr. at 285.

Regarding plaintiff's psychiatric history, plaintiff reported to Dr.
Christie that he had visited Gateway Community Services Board once a
month for the previous six months[4] though the staff there wished to see
him twice a week.  Tr. at 286.  Plaintiff expressed concern over financial
difficulties and doctor bills, including the fear that he and his family would
lose their house.  Tr. at 286.  He listed four medicines he was currently
taking[5] and said that he was supposed to be on other medications but could

---

[4]The ALJ's findings noted that the medical record only indicated one visit by
plaintiff to Gateway.  Tr. at 17.

[5]These medications were Pravachol (prescribed by Dr. Hardigan; used to lower
cholesterol), Metroprolol (prescribed by Dr. Hardigan; used to treat high blood pressure
and chest pain), Darvocet (prescribed by Dr. Bishop; a narcotic analgesic used to combat

not afford them.  Tr. at 286.  He noted that his family had a history of mental health problems, noting that they are "all about crazy." Tr. at 286.

Plaintiff told Dr. Christie that his last job was with the paper mill as a millwright until the plant closed in 1998.  Tr. at 286.  Plaintiff linked his inability to work with the pain in his back and legs, as well as headaches and trouble understanding what people say to him. Tr. at 286.  Dr. Christie noted that plaintiff got up several times during her evaluation and told her that it hurt him to sit.  Tr. at 286.  Dr. Christie also observed that plaintiff did not seem to have difficulty understanding during their meeting.  Tr. at 286.

Dr. Christie assessed plaintiff's mental health using formal testing as well as her own professional observation.  Tr. at 287-93.  She believed that plaintiff put forth minimal effort on these tasks, as well as exaggerating his symptoms.  Tr. at 287.  Dr. Christie concluded that "claimant had unlimited ability to follow work rules, use judgment, deal with work stresses, function independently,  maintain attention/concentration; unlimited ability [to] understand, remember and carry out complex job instructions, detailed, [b]ut not complex, job instructions and simple job instructions." Tr. at 18.

---

pain), and Zoloft (prescribed by Dr. Halani; used for depression).  Tr. at 286.

In addition, plaintiff "ha[d] fair ability to relate to co-workers, deal with the public, and interact with supervisors." Tr. at 18.  Though plaintiff reported difficulty in some of these areas, objective test results did not support such conclusions.  Tr. at 18.

On December 22, 2000, plaintiff saw Dr. Hardigan, complaining of atypical chest pain, lower back pain, and weakness in his legs.  Tr. at 295-96.  Dr. Hardigan's report noted that plaintiff was under considerable stress.  Tr. at 295.  During a stress test, plaintiff's heart rate and blood pressure remained normal.  Tr. at 295.  Dr. Hardigan concluded that plaintiff's symptoms were stress-induced and not related to any coronary problem.  Tr. at 295.  Dr. Hardigan reassured plaintiff and continued cholesterol treatment.  Tr. at 296.

## II.   STANDARD OF REVIEW

Judicial review of the Commissioner's decision to deny benefits pursuant to sentence four of 42 U.S.C. § 405(g) is limited.  The reviewing court may not decide the facts anew, re-weigh the evidence, or substitute its judgment for that of the ALJ.  Barron v. Sullivan, 924 F.2d 227, 229-30 (11th Cir. 1991); Arnold v. Heckler, 732 F.2d 881, 883 (11th Cir. 1984).

Even if the weight of the evidence is contrary to the ALJ's determination, the Court must affirm the administrative decision if there is substantial evidence in the record to support it.  Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Barron, 924 F.2d at 230; Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Walden v. Schweiker, 672 F.2d 835, 839 (11th Cir. 1982).  Nonetheless, this standard does not relieve the Court of its duty to scrutinize carefully the entire record to determine whether substantial evidence supports each essential administrative finding.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983); Walden, 672 F.2d at 838.

The presumption of validity afforded to the ALJ's findings of fact, however, does not apply to his conclusions of law.  Martin, 894 F.2d at 1529; Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982).  Failure to apply correct legal standards or to provide the Court with a basis to determine whether correct legal standards were applied constitutes grounds for reversal.  Martin, 894 F.2d at 1529; Wiggins, 679 F.2d at 1389.

Under sentence six of 42 U.S.C. § 405(g), courts are permitted to remand a case to the Social Security Administration for consideration of

newly discovered evidence.  <u>Falge v. Apfel</u>, 150 F.3d 1320, 1323 (11th Cir. 1998).  In order for the court to remand the case, a plaintiff must "show that (1) new, noncumulative evidence exists, (2) the evidence is material such that a reasonable possibility exists that the new evidence would change the administrative result, and (3) good cause exists for the applicant's failure to submit the evidence at the appropriate administrative level."  <u>Cherry v. Heckler</u>, 760 F.2d 1186, 1194 (11th Cir. 1985).  "[T]he judicial determination whether remand is necessary is a *de novo* proceeding."  <u>Id.</u>

## III.  ANALYSIS

Plaintiff raises two issues in his request for review: (1) whether the ALJ properly determined that plaintiff was "not disabled" for the purposes of establishing a period of disability and granting disability insurance benefits and (2) whether the ALJ properly determined if plaintiff was disabled and entitled to supplemental security income benefits under Section 1614(a)(3)(A) of the Social Security Act.  Plaintiff did not raise the issue of supplemental security income benefits before the ALJ; therefore, the Court will not consider that issue here.  Plaintiff also submits new

evidence to the Court, which was not considered by the ALJ or Appeals
Council.

### A.   Basis of ALJ's Finding of "Not Disabled"

The Commissioner has adopted a five-step analysis for evaluation of
disability claims.  20 C.F.R. § 404.1520.  At step one, the Commissioner
must inquire whether the plaintiff was employed during the period of the
alleged disability.  If the plaintiff held substantial gainful employment
during the time of the alleged disability, the Commissioner must deny
benefits.  At step two, the Commissioner must determine whether the
plaintiff suffers from a severe impairment.  Upon a conclusion that the
plaintiff's impairment is severe, the Commissioner must determine whether
the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404,
Subpt. P., App. 1.  A finding that the impairment meets or equals a listed
impairment conclusively establishes disability (step three).   If the
impairment, though severe, does not meet or equal a listed impairment, the
Commissioner must review the plaintiff's residual functional capacity and
the physical and mental demands of past work (step four).  If the plaintiff
can still perform past work, the Commissioner will find that the plaintiff is
not disabled.  If, on the other hand, the Commissioner finds that the

plaintiff cannot perform past work, he must then determine whether the plaintiff, based on age, education, and past experience, can perform other work (step five).

The ALJ here found that plaintiff satisfied step one because there was no evidence that he had engaged in substantial gainful activity after the date of the alleged onset of disability, March 18, 1999. Tr. at 15. He therefore proceeded to step two of the sequential evaluation process. With regard to step two, the ALJ concluded that plaintiff had severe impairments with respect to his back and leg pain but that his shortness of breath and heart problems were not severe impairments.[6] Tr. at 15. The ALJ also concluded that plaintiff's depression was a severe impairment. Tr. at 22. Because plaintiff had severe impairments, the ALJ found that step two was satisfied in plaintiff's favor. Tr. at 15.

After a thorough recounting of the medical record, the ALJ determined whether any of plaintiff's severe impairments met the criteria

---

[6]The ALJ noted that there were "no credible findings to support that claimant's ability is affected by a breathing impairment, high blood pressure, or heart impairment to even a minimal degree in his ability to function on a regular and sustained basis." Tr. at 19. In March 1999, a catheterization showed no evidence of coronary disease. Tr. at 19. In fact, despite repeated complaints of various heart, chest, and lung difficulties, there is no objective evidence in the record that indicates plaintiff suffered from any of these conditions, other than the presence of three small lead pieces in his chest, the residue of a gunshot wound when plaintiff was fifteen.

of the impairments listed in Appendix 1 of the Regulations, 20 C.F.R. Pt. 404, Subpt. P., App. 1.  Tr. at 19-20.  The ALJ considered Listing 1.05C, other vertebrogenic disorders, based on plaintiff's back ailments.  The ALJ found that plaintiff's impairments, though severe, did not meet the language of Listing 1.05C because there was "no evidence of pain, muscle spasm, and significant limitation of motion in the spine."  Tr. at 19.  This finding was made on the basis of the objective evidence in the record, including a finding of a normal range of motion in plaintiff's lower extremities in an April 2000 evaluation.  Tr. at 17.

The ALJ further considered Listing 12.02, organic mental disorders, which was not met because plaintiff did not show "a loss of specific cognitive abilities or affective changes."  Tr. at 19.  The ALJ noted that Dr. Sutcliffe's November 1999 report observed plaintiff as sedated and described him behaving as if under the influence of a narcotic or tranquilizer.  Tr. at 19, 228.  The ALJ also noted that by April 2000, plaintiff was reporting drinking a couple of alcoholic drinks a day.  Tr. at 19, 273.  The objective medical evidence in the record consistently notes that plaintiff's lack of motivation and sub-maximal effort skewed or negated test results.  Furthermore, Dr. Halani's report concluded that his cognitive

function, memory, judgment, and insight were intact.  Tr. at 17.

The ALJ considered Listing 12.08, personality disorders, and found that plaintiff did not suffer an impairment under that Listing because he had "not demonstrated that his personality traits are inflexible, maladaptive, or cause either significant impairment in social or occupational functioning or subjective stress."  Tr. at 19.  While plaintiff complained of various personality shortcomings such as irritability and anxiousness, objective medical evidence showed that such problems would not interfere with plaintiff's work ability.  Tr. at 18.

Finally, the ALJ considered Listing 12.09, substance addiction disorders.  Tr. at 20.  The ALJ ordered a psychological consultative evaluation by Dr. Christie in order to fully examine this issue.  The ALJ found that plaintiff's alcohol abuse did not cause mental or physical conditions severe enough to qualify as an impairment under Listing 12.09.  Ultimately, Dr. Christie concluded that "claimant's current emotional and intellectual functioning are unlikely to impair his ability to attain and maintain employment."  Tr. at 20.

The ALJ proceeded to examine plaintiff's residual functional capacity under steps four and five of the evaluation process.  Tr. at 20.  The ALJ

found that plaintiff retained the ability to perform work not exceeding the sedentary exertional level.  Tr. at 21.  Plaintiff's previously worked as a millwright, which is skilled work at the heavy exertional level.  Tr. at 21.  The ALJ found that none of plaintiff's acquired work skills transferred to sedentary or light exertional work.  Tr. at 21.  The vocational expert stated that, in his opinion, plaintiff could not return to his previous work as a millwright.  Tr. at 21, 318-24.  The ALJ concluded that plaintiff could not perform his previous work, resulting in a finding in favor of plaintiff in step four.  Tr. at 21.

After weighing plaintiff's subjective complaints with the objective medical evidence in the record, the ALJ determined that plaintiff retained the residual functional capacity to perform work not exceeding the sedentary exertional level:

> Specifically, the claimant retains the residual functional capacity to lift and/or carry 10 pounds occasionally and 10 pounds frequently; stand and/or walk less than two hours each 8-hour workday; sit the entire work day with the option to alternate sitting position up to 3 times each work hour; and is limited in the ability for repetitive pushing and pulling in the lower extremities.

Tr. at 21.  The ALJ determined that plaintiff could perform the "full range"

of sedentary work, which would automatically mandate a finding of "not disabled" under Medical-Vocational Rule 201.28. Tr. at 22. Thus, the burden was on the Social Security Administration to show that there were a significant number of jobs available in the national economy for a person with plaintiff's profile. Tr. at 22.

The vocational expert testified that plaintiff was capable of working as an inspector, with 2,500 jobs in the local area and 150,000 jobs nationally, or as an assembler, with 2,000 jobs locally and over 150,000 jobs nationally. Tr. at 22, 321. The vocational expert conceded during cross examination by plaintiff's attorney that these sedentary jobs might not be viable options for a person who would be completely off-task for one-half to two-thirds of the workday due to lack of concentration. Tr. at 321. The vocational expert also testified that for a person who could only sit for fifteen minutes at a time before needing to stand or move around for ten minutes the job of assembler would be unavailable and the number of jobs in the inspector category would decrease by half. Tr. at 322-23. However, these hypotheticals were considered by the ALJ when he made his decision. Specifically, the ALJ discounted plaintiff's subjective testimony and found that there were sufficient jobs in the local and national economies such that

step five was resolved against plaintiff.  Tr. at 23.

## B.   New Evidence Presented to the Court

Plaintiff relies on new evidence to argue that his case should be remanded for reconsideration by the Social Security Administration.  Doc. 2, p. 4-5.  This evidence includes a January 8, 2002, diagnosis as having "Bipolar and Schizophrenia disorder," a February 8, 2002, diagnosis for asthma, and his prison classification as chronic care with respect to his back and lungs.  Doc. 2, p. 4.  Plaintiff also notes he now wears prescription eyeglasses and has prostate problems.  Doc. 2, p. 5.

This new evidence does not meet the standard dictating remand set forth in Cherry v. Heckler, 760 F.2d 1186, 1194 (11th Cir. 1985).  Plaintiff's complaints regarding his back, lungs, and eyes are not noncumulative.  The record before the ALJ adequately documented plaintiff's troubles in these areas, which were considered by the ALJ.  In addition, plaintiff does not actually include new evidence of these problems more than unsupported assertions in his complaint.  The same lack of substantiation is true for his alleged prostate problems.   A review of the record and supporting documents accompanying plaintiff's complaint reveals that plaintiff has not actually presented new evidence of such problems.

Plaintiff does present evidence of his bipolar disorder and asthma diagnosis. The evidence plaintiff presents is contained in three pages: a one page excerpt from what appears to be a medical report, a one page attachment of addresses for four area hospitals and treatment centers, and a document appearing to be a prescription for two drugs, Lamictal and Risperdal, both used to treat bipolar disorder. Doc. 2, Ex. A. The one page medical report excerpt does contain a paragraph explaining plaintiff's diagnosis with asthma, as well as two paragraphs detailing his mental health issues. Regarding asthma,[7] the report states that plaintiff saw Judith M. Porter, M.D., at Southeast Lung and Critical Care on February 8, 2002 and was diagnosed with asthma and prescribed Advair for asthma treatment and Nexium for acid reflux. Doc. 2, Ex. A.

With respect to plaintiff's mental health, the report states that plaintiff contacted a United States Probation Officer on December 10, 2001, and told the officer that he was going crazy. The Probation Office referred plaintiff to Chemical Dependency Counseling, which he attended four times over the next month. At Chemical Dependency Counseling, plaintiff was

---

[7]There is some evidence in the original record of complaints of asthma, but there is no indication in the ALJ's ruling that the ALJ considered plaintiff's asthma. Tr. at 278.

tentatively diagnosed with schiztypal personality disorder.  Plaintiff was formally diagnosed with bipolar disorder on January 8, 2002, according to the one page medical report excerpt.  The report does not mention which doctor at which facility made this determination.  The report goes on to say that, on January 29, 2002, plaintiff reported to Gateway with suicidal thoughts, was admitted to Georgia Regional Hospital of Savannah, and stayed there until February 5, 2002.  Presumably this is when doctors prescribed plaintiff medicine for bipolar disorder, as the third page of plaintiff's exhibit is a prescription written on stationary from the Georgia Regional Hospital, though the date and doctor's name are illegible.

The Court notes the unreliability of plaintiff's evidence.  The only substantive offering, the one page medical record excerpt, fails to acknowledge the author or date the document was written.  The Court cannot accept allegations such as those submitted in plaintiff's exhibit as true without some attestation and acknowledgment to the Court.  Likewise, the drug prescription fails to adequately identify the date or doctor. Without more background and substantiation regarding this new evidence, the Court is hesitant to send this case back for more administrative proceedings, when such proceedings may prove utterly wasteful and

irrelevant.

Even if plaintiff's new evidence was sufficient for the Court to consider remanding the case to the Social Security Administration, the Court declines to do so because prong three of the three-part standard established in Cherry is not met. Prong three requires that a plaintiff must show that "good cause exists for the applicant's failure to submit the evidence at the appropriate administrative level." Cherry, 760 F.2d at 1194. In cases remanding Social Security appeals back to the administrative level, good cause is shown where the evidence was not available at the time of the previous administrative proceedings. See, e.g., Smith v. Bowen, 792 F.2d 1547, 1550 (11th Cir. 1986) (plaintiff "has established good cause for failure to submit the evidence at the administrative level because it did not exist at that time"). Cases allowing new evidence where the evidence existed at the time of the administrative proceeding differ significantly from the instant case because those cases involve minimal procedural default. See, e.g., White v. Barnhart, 373 F. Supp. 2d 1258, 1264-64 (N.D. Ala. 2005) (acknowledging that good cause is usually shown where the evidence did not exist; excusing procedural default in this case where plaintiff mailed in new evidence to Appeals Council one

day late and Appeals Council still had time to consider evidence but chose not to).  Courts in this Circuit have gone so far as to reject remand when new evidence was not available at the time of the administrative proceedings but arguably could have been or should have been available due to the delay of plaintiff in seeking such evidence.  See, e.g., Harris v. Apfel, 1999 WL 33915955, *2-4 (S.D. Ala. Oct. 14, 1999) (noting that plaintiff had retained counsel, knew that plaintiff wanted to argue psychological issues, recognized the insufficiency of the record, and failed to acquire evidence for the record until after the ALJ's decision).

Plaintiff has not attempted to show good cause, and an examination of the record indicates that he could not.  Plaintiff had ample opportunity to present his "new" evidence prior to his proceedings before this Court. The evidence plaintiff relies on occurred between December 10, 2001 and February 8, 2002.  At the same time, plaintiff's appeal of the ALJ's decision was pending before the Appeals Council.  Tr. at 8.  On August 6, 2002, six months after the relevant events occurred related to plaintiff's "new" evidence, the Appeals Council notified plaintiff's retained counsel that "[t]he Appeals Council will consider any additional evidence that is both new and material to the issues considered in the hearing decision dated

March 9, 2001. . . . [Y]ou should send any such evidence directly to the Council within 25 days from the date of this letter." Tr. at 7. Plaintiff, though fully knowledgeable of any new developments in the medical evidence related to his case, failed to present the Appeals Council with any new, material evidence. The Appeals Council went on to deny plaintiff review of the ALJ decision on October 24, 2002. Tr. at 5-6.

Finally, any new evidence submitted after the decision of the ALJ must relate to the time period under consideration by the ALJ. See 20 C.F.R § 416.1470(b) ("Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."). The Court will not remand to the Appeals Council based on "new" evidence that the Appeals Council may not consider. In this case, plaintiff's evidence is based on new diagnoses which occurred in early 2002, more than eight months after the ALJ's decision, and he has not shown that the new evidence relates to the period under consideration.

**CONCLUSION**

Based on the foregoing, the Court RECOMMENDS that the decision

31

of the Commissioner be AFFIRMED.

**SO REPORTED AND RECOMMENDED** this ___9ᵗʰ___ day of

**December, 2005.**

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA